Chief Judge Brbitel.
 

 On claimant Fleeter Thorpe’s appeal, the issue is whether the daughter of a patient in a State hospital, falsely advised that the patient, her mother, had died, may recover from the State for emotional harm. She sustained the harm as a direct result of the negligent misinformation provided by the hospital in the course of it advising relatives of the death of a patient. The mother was in fact alive and well.
 

 Claimant and her aunt, Nellie Johnson, since deceased, had filed a claim against the State for funeral expenses incurred, emotional harm and punitive damages. The Court of Claims awarded claimant $7,500 for funeral expenses undertaken on the false information, and for emotional harm. It denied her punitive damages, and dismissed the aunt’s claim for insufficiency. The State appealed to the Appellate Division and claimants cross-appealed. The Appellate Division modified, limiting the daughter’s award to her pecuniary losses of $1,658.47, and otherwise affirmed as to both claimants. The aunt’s estate, unlike the daughter, took no further appeal to this court.
 

 There should be a reversal. The daughter of a hospital patient may recover for emotional harm sustained by her as a result of negligent misinformation given by the hospital that
 
 *380
 
 her mother had died. Key to liability, of course, is the hospital’s duty, borne or assumed, to advise the proper next of kin of the death of a patient.
 

 Claimant’s mother, Emma Johnson, had been a patient in the Hudson River State Hospital since 1960. On August 6, 1970, another patient, also named Emma Johnson, died. Later that day, the hospital sent a telegram addressed to Nellie Johnson of Albany, claimant’s aunt and the sister of the living Emma Johnson. The telegram read:
 

 "REGRET TO INFORM YOU OF DEATH OF EMMA JOHNSON PLEASE NOTIFY RELATIVES MAKE BURIAL ARRANGEMENTS HAVE UNDERTAKER CONTACT HOSPITAL BEFORE COMING FOR BODY HOSPITAL WISHES TO STUDY ALL DEATHS FOR SCIENTIFIC REASONS PLEASE WIRE POST MORTEM CONSENT
 

 HUDSON RIVER STATE HOSPITAL”
 

 In accordance with the instructions in the telegram, claimant was notified of her mother’s death by her aunt. An undertaker was engaged; the body of the deceased Emma Johnson was released by the hospital and taken to Albany that night. A wake was set for August 11, with burial the next day. In the interim claimant incurred expenses in preparing the body for the funeral, and in notifying other relatives of her mother’s death.
 

 On the afternoon of the wake, claimant and her aunt went to the funeral home to view the body. After examining the body, both claimant and her aunt remarked that the mother’s appearance had changed. Nellie Johnson also expressed doubt that the corpse was that of her sister Emma. Thereafter the doubts built up, and upon returning that evening for the wake, claimant, in a state of extreme distress, examined the corpse more closely and verified that it was not that of her mother. At this point, claimant became "very, very hysterical”, and had to be helped from the funeral chapel.
 

 The hospital was called, and the mistake confirmed. Claimant’s mother was alive and well in another wing of the hospital. Later that evening at the hospital, the deputy director, with the authorization of the director, admitted the mistake to claimant and her aunt. Upon the trial it appeared that the hospital had violated its own procedures and with gross carelessness had "pulled” the wrong patient record.
 

 After this incident, claimant did not work in her employment for more than 11 days. She complained of "[recurrent
 
 *381
 
 nightmares, terrifying dreams of death, seeing the coffin * * * difficulty in concentrating, irritability, inability to function at work properly, general tenseness and anxiety.” Her psychiatrist testified that "She appeared to be somewhat depressed, tremulous. She seemed to be under a considerable amount of pressure. She cried easily when relating events that occurred. I though that she spoke rather rapidly and obviously perspiring.” Both her psychiatrist and that of the State agreed that, as a result of the incident, claimant suffered "excessive anxiety”, that is, anxiety neurosis. Her expert, as indicated, testified that she showed objective manifestations of that condition.
 

 One to whom a duty of care is owed, it has been held, may recover for harm sustained solely as a result of an initial, negligently-caused psychological trauma, but with ensuing psychic harm with residual physical manifestations
 
 (Battalla v State of New York,
 
 10 NY2d 237, 238-239;
 
 Ferrara v Galluchio,
 
 5 NY2d 16, 21-22; cf. Restatement, Torts 2d, § 313, subd [1]; see, generally,
 
 Tobin v Grossman,
 
 24 NY2d 609, 613; Prosser, Torts [4th ed], § 54, pp 330-333; 2 Harper and James, Law of Torts, § 18.4, pp 1032-1034; Torts — Emotional Disturbances, Ann., 64 ALR2d 100, 143, § 11
 
 et seq.).
 
 In the absence of contemporaneous or consequential physical injury, courts have been reluctant to permit recovery for negligently caused psychological trauma, with ensuing emotional harm alone (see Restatement, Torts 2d, § 436A; Prosser, Torts [4th ed],
 
 op. cit.,
 
 pp 328-330, and cases collected; 2 Harper and James, Law of Torts,
 
 op. cit.,
 
 pp 1031-1032, and cases collected; Torts — Emotional Disturbances, Ann., 64 ALR2d 100, 115, § 7; cf.
 
 Weicker v Weicker,
 
 22 NY2d 8, 11). The reasons for the more restrictive rule were best summarized by Prosser
 
 (op. cit.,
 
 p 329): "The temporary emotion of fright, so far from serious that it does no physical harm, is so evanescent a thing, so easily counterfeited, and usually so trivial, that the courts have been quite unwilling to protect the plaintiff against mere negligence, where the elements of extreme outrage and moral blame which have had such weight in the case of the intentional tort are lacking”. Contemporaneous or consequential physical harm, coupled with the initial psychological trauma, was, however, thought to provide an index of reliability otherwise absent in a claim for psychological trauma with only psychological consequences.
 

 There have developed, however, two exceptions. The first is
 
 *382
 
 the minority rule permitting recovery for emotional harm resulting from negligent transmission by a telegraph company of a message announcing death (see cases collected in Restatement, Torts 2d, App, § 436A; Prosser,
 
 op. cit.,
 
 p 329; but see
 
 Western Union Tel. Co. v Speight,
 
 254 US 17, 18;
 
 Curtin v Western Union Tel. Co.,
 
 13 App Div 253, 255-256 [majority rule denying recovery]. The Federal rule does, however, permit recovery where the psychological trauma results in physical illness, see
 
 Kaufman v Western Union Tel. Co.,
 
 224 F2d 723, 731, cert den 350 US 947).
 

 The second exception permits recovery for emotional harm to a close relative resulting from negligent mishandling of a corpse (see Prosser,
 
 op. tit.,
 
 pp 329-330, and cases collected). Recovery in these cases has ostensibly been grounded on a violation of the relative’s quasi-property right in the body (see
 
 Darcy v Presbyterian Hosp.,
 
 202 NY 259, 262; but cf.
 
 Owens v Liverpool Corp.
 
 [1939], 1 KB 394, 400 [CA] [applying negligence principles], disapproved in
 
 Hay or Bourhill v Young
 
 [1943], AC 92, 110 [HL] [per Lord Wright], but applied in
 
 Behrens v Bertram Mills Circus
 
 [1957], 2 QB 1, 28 [Devlin, J.]). It has been noted, however, that in this context such a "property right” is little more than a fiction; in reality the personal feelings of the survivors are being protected (Prosser,
 
 op. cit.,
 
 p 59).
 

 In both the telegraph cases and the corpse mishandling cases, there exists "an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious” (p 330). Prosser notes that "[t]here may perhaps be other such cases” (p 330; see
 
 Nieman v Upper Queens Med. Group,
 
 220 NYS2d 129, 130, in which plaintiff alleged emotional harm due to negligent misinformation by a laboratory that his sperm count indicated sterility; and defendant’s motion for judgment on the pleadings was denied). The instant claim provides an example of such a case.
 

 As the Appellate Division correctly found and the State in truth concedes, the hospital was negligent in failing to ascertain the proper next of kin when it mistakenly transmitted the death notice to claimant’s aunt and through her, at its behest, to claimant. While for one to be held liable in negligence he need not foresee novel or extraordinary consequences, it is enough that he be aware of the risk of danger. The consequential funeral expenditures and the serious psy
 
 *383
 
 chological impact on claimant of a false message informing her of the death of her mother, were all within the "orbit of the danger” and therefore within the "orbit of the duty” for the breach of which a wrongdoer may be held liable
 
 (Palsgraf v Long Is. R. R. Co.,
 
 248 NY 339, 343). Thus, the hospital owed claimant a duty to refrain from such conduct, a duty breached when it negligently sent the false message. The false message and the events flowing from its receipt were the proximate cause of claimant’s emotional harm. Hence, claimant is entitled to recover for that harm, especially if supported by objective manifestations of that harm.
 

 Tobin v Grossman
 
 (24 NY2d 609,
 
 supra)
 
 is not relevant. In the
 
 Tobin
 
 case, the court held that no cause of action lies for unintended harm sustained by one, solely as a result of injuries inflicted directly upon another, regardless of the relationship and whether the one was an eyewitness to the incident which resulted in the direct injuries (p 611). In this case, however, the injury was inflicted by the hospital directly on claimant by its negligent sending of a false message announcing her mother’s death. Claimant was not indirectly harmed by injury caused to another; she was not a mere eyewitness of or bystander to injury caused to another. Instead, she was the one to whom a duty was directly owed by the hospital, and the one who was directly injured by the hospital’s breach of that duty. Thus, the rationale underlying the
 
 Tobin
 
 case, namely, the real dangers of extending recovery for harm to others than those directly involved, is inapplicable to the instant case. (Nor is
 
 Matter of Wolfe v Sibley, Lindsay & Curr Co.,
 
 36 NY2d 505, relevant to the tort rationale or holding in this case. There recovery was allowed solely on the elastic basis permitted by the Workmen’s Compensation Law as applied in the courts.)
 

 Moreover, not only justice but logic compels the further conclusion that if claimant was entitled to recover her pecuniary losses she was also entitled to recover for the emotional harm caused by the same tortious act. The recovery of the funeral expenses stands only because a duty to claimant was breached. Such a duty existing and such a breach of that duty occurring, she is entitled to recover the proven harmful consequences proximately caused by the breach. In the light of the
 
 Battalia
 
 and
 
 Ferrara
 
 cases
 
 (supra),
 
 and the reasoning upon which they were based, recovery for emotional harm to one subjected directly to the tortious act may not be disallowed so
 
 *384
 
 long as the evidence is sufficient to show causation and substantiality of the harm suffered, together with a "guarantee of genuineness” to which the court referred in the
 
 Ferrara
 
 case (5 NY2d 16, 21,
 
 supra;
 
 see, also,
 
 Battalla v State of New York,
 
 10 NY2d 237, 242,
 
 supra).
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the matter remitted to that court for a determination of the facts in accordance with CPLR 5613.
 

 Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
 

 Order reversed, with costs, and case remitted to Appellate Division, Third Department, for further proceedings in accordance with the opinion herein.